Argued September 12, affirmed October 17, 1916, rehearing denied January 23, 1917.

## WAKEFIELD *v*. SUPPLE.*

(160 Pac. 376.)

**Appeal and Error—Review—New Trial.**

1. The trial court having the power, within the time allowed, to set aside a final determination and order a new trial when it discovers a mistake of law has been made which would necessitate a reversal on review, the question to be considered on appeal from an order allowing a motion to set aside a verdict and judgment, and for

---

*Upon the question of effect of parol modification of original contract which is required to be in writing, see note in 4 L. R. A. (N. S.) 980.                    REPORTER.

a new trial, because of error committed by overruling a motion for nonsuit and a motion for a directed verdict for defendant because an alleged oral modification of an original written contract was not established, is whether the evidence received in respect to the alleged oral modification was sufficient to authorize a submission of the cause to the jury.

Contracts — Modification — Written    Contracts — Subsequent    Parol
    Agreement.

2. The terms of a written contract may be altered by a subsequent parol agreement of the parties.

Contracts—Evidence—Sufficiency.

3. In an action to recover compensation for additional work done, not contemplated in an original written agreement, but alleged to have been authorized by a subsequent parol modification of the written contract, evidence of conversations and correspondence between the parties *held* insufficient to go to the jury as tending to establish that the alleged subsequent oral agreement modifying the written contract was made.

[As to validity and construction of provision in building contract permitting alterations or modifications, see note in Ann. Cas. 1915D, 758.]

From Multnomah: JOHN P. KAVANAUGH, Judge.

Department 2.    Statement by MR. CHIEF JUSTICE MOORE.

This is an action by Robert Wakefield against Joseph Supple to recover money. The basis of the action is a contract, set out in the complaint, and reads:

"Joseph Supple having entered into a subcontract with the Portland Iron Works for the furnishing of all labor and material and for the building of steel hulls, trusses, ladders, etc., as well as all carpenter and wood work, for the two United States engineers' dredges 'Multnomah' and 'Wahkiakum,' hereby enters into an agreement with Robert Wakefield, whereby on consideration hereinafter mentioned:

"Joseph Supple agrees to prepare the ways, falsework and scaffolding, at the yards of the O.-W. R. R. & N., known as the 'Boneyard,' for the building and erection of the two dredges above named, and deliver f. o. b. cars, all of the steel work for hull, fabricated and ready for erection, but not riveted, nor bolted up,

and all of the steel work for trusses and ladder, fabricated and riveted, but not assembled.

"Robert Wakefield agrees that he will receive this material from cars, and will furnish his own means and apparatus for unloading the material, storing same until wanted, and erect and assemble same in place, in accordance with the plans and specifications, approved for this work, by the United States engineers.

"That he will do all of the bolting up, riveting, calking and testing, to the satisfaction of the inspector, and in accordance with these plans and specifications.

"Joseph Supple will furnish all labor and material necessary for blocking, staging and launching. It being herewith reiterated, that all tools and all gears for handling and rigging of all steel work of whatever nature, will be furnished by Robert Wakefield, and that all wood work and material and labor for foundations will be furnished by Joseph Supple, except that used for hoisting and hoisting gears.

"In consideration of the above agreement, Joseph Supple agrees to pay Robert Wakefield, fifteen dollars ($15.00) for every ton of hull material erected and put together, and seven and one-half dollars ($7.50) per ton for the assembling of the trusses and ladders.

"It is mutually agreed on, that the actual weight on cars shall be ascertained from the R. R. Co., and that these weights shall be taken as basis on which Robert Wakefield shall make his charges.

"Joseph Supple agrees to make payments to Robert Wakefield, at the time and at the rate, as he receives his payments for work completed from the Portland Iron Works.

"It is particularly understood between the two contracting parties, that the same conditions of the terms of the specifications above referred to, as well as the conditions of the contract entered upon between Joseph Supple, and the Portland Iron Works, as far as they prevail, and that any dispute as to the interpretation of these specifications and contract, shall be subject to the decision of the inspector representing the contracting engineer of the U. S. government.

"Inasmuch as Joseph Supple has entered into a sub-contract with the Great Lakes Engineering Company, of Detroit, Michigan, to fabricate for him the steel hull material above mentioned, and inasmuch as this last-named company is responsible for the proper fabrica-tion of the material, in accordance with the specifica-tions and plans, and have agreed to have one of their men present while the work of erection and assembling is under way, it is hereby agreed that Robert Wake-field hereby accepts the guarantee furnished Joseph Supple by the said Great Lakes Engineering Works, and agrees to take up and settle with said representa-tive, any discrepancies which may be discovered on the work and material, and make his own agreements for extra charges for the correction of any possible changes or mistakes discovered, due to faulty fabrica-tion on the part of the Great Lakes Engineering Works.

"In witness of the above the parties herein men-tioned have hereto set their hands and seals.

"Portland, Ore., Feb. 11, 1913.

"[Signed]     JOSEPH SUPPLE.
"[Signed]     ROBERT WAKEFIELD."

The initiatory pleading charges, in effect: That when the plaintiff entered into that agreement he had been and was a bridge builder, and was unacquainted with the construction of any part of a ship or the cost of doing such work. That the defendant for a long time had been engaged in shipbuilding and knew the plaintiff was not familiar therewith, and that he re-lied upon the representations made by the defendant and his agents in relation thereto. That, when in-formed of the plaintiff's want of knowledge in these particulars, the defendant advised him to consult with Fred Ballin, a shipbuilding engineer who had pre-pared the plans for the dredges and was to have charge of the construction thereof and upon whose word he could rely. That plaintiff thereupon conferred with

Ballin, who informed him that the steel plates to be used in building the dredges would arrive in Portland, Oregon, with all the smaller parts riveted to the larger portions in such manner as to be conveniently shipped by rail, and plaintiff would be required only to bolt and rivet the larger sections together on the job; that the material to be used would be free from rust, each piece plainly marked, all plates to be calked would be beveled-sheared; that all punched holes would be reamed so as to countersink the rivet heads; that all necessary bolts would be supplied by the defendant; that plaintiff would be required to drive only about 150 rivets to the ton of material; and that all the plates would be painted before delivery. That the plaintiff believed and relied upon each of these representations. That at the time they were made Ballin was interested with the defendant in whatever profits the latter might make under his contract for constructing the dredges, of which partnership the plaintiff had no knowledge. That immediately upon signing the contract the plaintiff engaged mechanics and laborers, assembled his machinery, and notified the defendant of his readiness to commence work on the dredges, but no material therefor was delivered until June 15, 1913, when that which arrived was not connected in any manner. That no bolts were furnished. That it was necessary for the plaintiff to drive 240 rivets to the ton of material. That the members thereof were not marked for identification. That the punched holes did not fit one with another and were not reamed, and that the material was rusty and unpainted. That at the time Ballin made such representations he knew they were false and uttered them with intent to defraud the plaintiff and to induce him to enter into the contract hereinbefore set forth. That when the delivery of the ma-

terial was thus delayed, and the plaintiff discovered the extra amount of work required, and learned of Ballin's financial interest in the profits which he was to obtain, the plaintiff informed the defendant of the falsity of his agent's representations, called attention to the faulty condition of the material, and to the amount of work necessary to assemble and prepare the parts, and informed him of the resulting delay and damage which the plaintiff would sustain by reason thereof.

"That thereupon the defendant orally requested plaintiff to enter upon and complete the work of erecting said materials in place, and thereupon agreed orally with plaintiff that he [defendant] would pay plaintiff whatever the work and labor was found to be reasonably worth at the conclusion of said work, taking into account all the facts and circumstances in connection with the work, including the delay, and agreed to pay plaintiff the reasonable worth and value of any materials furnished by plaintiff. That, in reliance upon said oral promise, this plaintiff did completely erect and assemble all materials in place for said two hulls upon the dredges 'Multnomah' and 'Wahkiakum' and furnished various materials therefor. That the reasonable worth and value of the work, labors and materials so furnished by plaintiff to defendant upon said two hulls is the sum of $29,408.98, of which defendant has paid only $8,785, leaving a balance due plaintiff in the sum of $20,623,98, which balance and any part thereof defendant refuses to pay, and said defendant refuses to recognize that this plaintiff has any rights in the premises other than the rights fixed in the written contract hereinbefore referred to, and said defendant refuses to consider with plaintiff, plaintiff's rights in the premises, and defendant renounces and denies plaintiff's rights in the premises."

Judgment was demanded for the sum of $20,623.98.

The answer denied most of the material averments of the complaint, and particularly with respect to the

alleged misrepresentations mentioned. For a separate defense, the answer sets forth the circumstances attending the making of the contract and alleges that the plaintiff received from the Great Lakes Engineering Works, which corporation furnished the material that was used in constructing the dredges, various sums of money as compensation and settlement for changes necessitated in the material furnished, and for the mistakes in the fabrication thereof, and thereupon he agreed to withdraw his claim for extra compensation on account of reaming and countersinking, and by reason thereof he is now estopped to assert or claim that any sum is due him therefor. Other matters are set forth in the answer as further defenses.

The reply put in issue the allegations of new matter in the answer, and based on these issues the cause was tried, resulting in a verdict and judgment for the plaintiff in the sum of $4,500. Upon application therefor, it was determined in part as follows:

"The court, after hearing arguments of the respective counsel, being fully advised, and being of the opinion that error was committed during the trial by overruling the motion for nonsuit and overruling the motion for a directed verdict for defendant and that a new trial should be granted, it is therefore ordered that the motion to set aside the verdict and judgment, and for a new trial, be and the same is hereby allowed."

From this order the plaintiff appeals.

AFFIRMED.     REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Coy Burnett* and *Mr. McKinley Kane,* with an oral argument by *Mr. Burnett.*

For respondent · there was a brief with oral arguments by *Mr. Arthur Langguth* and *Mr. Henry L. Lyons*.

Opinion by MR. CHIEF JUSTICE MOORE.

1, 2. In *Smith Typewriter Co.* v. *McGeorge*, 72 Or. 523 (143 Pac. 905), it was held that when the trial court, within the time allowed, discovers that such a mistake of law has been made at the hearing of a cause as would necessitate a reversal of the judgment if brought up for review, such final determination may be set aside and a new trial ordered. To the same effect, see, also, *Rudolph* v. *Portland Ry., L. & P. Co.*, 72 Or. 560 (144 Pac. 93) ; *Frederick & Nelson* v. *Bard*, 74 Or. 457 (145 Pac. 669) ; *McGinnis* v. *Studebaker*, 75 Or. 519 (146 Pac. 825, 147 Pac. 525, L. R. A. 1916B, 868) ; *Delovage* v. *Old Oregon Creamery Co.*, 76 Or. 430 (147 Pac. 392, 149 Pac. 317) ; *Pullen* v. *Eugene*, 77 Or. 320 (146 Pac. 822, 147 Pac. 768, 1191, 151 Pac. 474). Predicated upon this rule, the question to be considered is whether or not the evidence received in respect to the alleged oral modification of the original contract was sufficient to authorize a submission of the cause to the jury. The rule is settled that the terms of a written contract may be altered by a subsequent parol agreement of the parties: *Pippy* v. *Winslow*, 62 Or. 219 (125 Pac. 298) ; *City Messenger Co.* v. *Postal Tel. Co.*, 74 Or. 433 (145 Pac. 657). The plaintiff's testimony tends to support the averments of the complaint in respect to the delay occasioned by failing to deliver the material within the time expected, and also as to the extra amount of labor necessitated by reaming the punched holes in the plates. In a letter which he wrote to the defendant May 28, 1913, in referring to these matters, he says:

"Of course, this long wait has caused me considerable expense, as I have had to keep men within call and keep a plant down there ready at all times to unload the material.   I think I am entitled to some compensation for all this delay and should be pleased to hear from you in the matter, as I do not wish to be unreasonable or make any unreasonable demands. Further, when I took the work it was expected that the erection bolts would be furnished with the material.   I have had to furnish these bolts and think it would be no more than right that you should pay for them, as I took the work at a very low figure.   As there is considerable of the material on hand now, we have started to get it together and think we should have some understanding about the lost time that has passed before going any further."

Plaintiff on June 11, 1913, again wrote the defendant as follows:

"I am assembling and riveting hulls for the two government dredges, the work having been undertaken, as per my contract of February 11, 1913.   Not having specifications or plans showing details and descriptions of the work, I derived my information for the work required from Fred A. Ballin.   At the time our contract was signed it was expected that the steel would arrive in a few days.   The last four cars of this steel arrived yesterday, being about two months later than expected and the other cars having been strung along one at a time made it necessary to keep a force of men on hand in readiness to unload this material and adding additional expense to the cost of the work.   It was expected that erection bolts would be furnished with this material and as I furnished these bolts I should be paid for the same.   The plates that have to be calked were to have been beveled-sheared, which was not done.   All connections were to have been riveted to the large members.   Failure to do this has increased the number of rivets to be driven and the steel being in small pieces adds to the difficulty and cost of handling same.   The wedges to be used

as stop waters at the butt of the lower sheets should have been punched at the shop, and this will have to be done before they are driven, as it would be too expensive to drill them after they are in place. As these changes will make the work cost more than the prices given in my contract, I suggest that you and Mr. Ballin meet me at the yard at your earliest convenience and reach some agreement to take care of this additional cost. I do not wish you to be dissatisfied nor do I wish to be out any money on account of this work.''

From a letter written by Wakefield to Supple July 12, 1913, an excerpt is taken as follows:

''I have written to you repeatedly stating the difference between the job we are doing and the job we contracted to do. The contract expressly stated that the material is to be fabricated, which I understand, means ready to put together, while the actual work we are doing is reaming the thing entirely all over, or, in other words, there has been no work done except merely punching and a very poor job at that. The material is badly marked so that it is very difficult to find the pieces that belong together and lots of the material that should be put together under the clause 'Fabrication' is shipped loose, little pieces of angle 2x2, 4 to 6 ft. in length. I have written you a great many times about these differences, but do not seem to get any direct results from them other than, 'will make it all right in the end' but there is so much to be made right that I think we ought to have an understanding now. I am perfectly willing to do as we agreed in our contract to leave our differences to the inspector for the government, Mr. Baxter. The clause in the contract referring to your having an agreement with the Great Lakes Engineering Company for the fabrication in which they are responsible for the proper execution of the same, their representative disclaims any responsibility for mistakes and says that the reaming is especially excluded from their contract.''

Replying to this communication, the defendant on July 14, 1913, wrote the plaintiff a letter, from which extracts are taken, viz.:

"Dear Sir: Your favor of the 12th inst. duly noted. You state that you have written a number of letters regarding our contract for the building of the two government dredges, and that I have failed to answer them in writing. Permit me to state that as far as differences are concerned, there is no need to take up any generalities, inasmuch as the contract itself, states very definitely and positively what part of the work is to be done by yourself and me. * * You further agreed to settle with the representative of the Great Lakes Engineering Works, any discrepancies which may be discovered on the work and material, and make your own agreements for extra charges, and for their collection for the correction of any possible changes or mistakes discovered, due to faulty fabrication on the part of the Great Lakes Engineering Works. * * You further state, that I made you understand that I would 'Make it all right in the end,' implying that I acknowledged that there was something to make all right. I wish to dispel this impression emphatically, as so far nothing has appeared on which you could base any claims against me under our contract. I did say and meant to say, that where you could show that I owed you any money in the end, I would pay you, provided you could make the right kind of a showing. * * I understand from Capt. Haight, representing the G. L. E. W., that he is willing to correct any mistakes made in fabrication."

The quotations from these letters partly express the dispute existing between the parties. It appears from the testimony that the plaintiff sustained a financial loss by reason of the delay in delivering the material; that he was hindered in the performance of his work in assembling the parts because the numbers placed thereon were worn off by transportation; and that he was hindered in attempting to find, or in pro-

curing, substituted parts. The evidence shows that
Mr. Wakefield settled with C. M. Haight, the represen-
tative of the Great Lakes Engineering Works, from
whom he received a credit for extra work. What sum
was thus accounted for is uncertain. Mr. Haight
stated upon oath that $135 was so credited, while S. R.
Booth, who as bookkeeper had charge of the plaintiff's
office, testified the plaintiff "received something like
$300 for these extras that cost him about $20,000."

It will be taken for granted that the plaintiff's testi-
mony was sufficient to be submitted to the jury as tend-
ing to substantiate the averments of the complaint
with respect to the existence of a partnership between
the defendant and F. A. Ballin, whereby the latter was
to have received a consideration for personally super-
vising the work of constructing the dredges. It will
also be assumed that Wakefield's testimony was ade-
quate to go to the jury as tending to establish the alle-
gations of the primary pleading as to Ballin's asserted
representations, though such imputed declarations are
denied by him. His financial interest in the contract
and his alleged falsification of material facts to the
plaintiff might show an inducement to modify the writ-
ten contract. While such incentive could afford a
valid reason for altering the original agreement, it is
insufficient by itself to sanction a change in any of the
terms of the writing.

In *Barber* v. *Toomey,* 67 Or. 452, 463 (136 Pac. 343,
346), Mr. Justice RAMSEY says:

"In order to establish a contract, the evidence
should show when, where, and with whom the contract
was made, and the terms thereof."

A transcript of the testimony given at the trial of
this cause, consisting of 812 pages, has been carefully
read and considered; but from such research we have

been unable to find any witness who testified to a modification of the original agreement.

The complaint charges:

"That upon the discovery by plaintiff of the delay in delivery of said materials and members and its condition, and the amount of work required to erect and assemble said materials in place and upon discovery by plaintiff that said Ballin was financially interested with said defendant in the profits to be made from said contract, this plaintiff informed defendant" thereof; and "that thereupon the defendant orally requested plaintiff to enter upon and complete the work of erecting said materials in place, and thereupon agreed orally with plaintiff that he [defendant] would pay plaintiff whatever the work and labor was found to be reasonably worth at the conclusion of said work."

The testimony shows that it required about three weeks to transport a carload of the material used in the construction of the dredges from Detroit, Michigan, where it was "fabricated," to Portland, Oregon, William Wakefield, the plaintiff's son, testified that the first carload was sent out from the factory March 18, 1913, and the last carload on May 21st of that year. The first carload should have arrived about April 10, 1913, when the plaintiff evidently discovered that the smaller parts of the material had not been bolted or riveted to the larger members, and that the marks that had been placed on the plates had been worn off in transit. An examination of the letter from Wakefield to Supple, July 12, 1913, wherein it is stated, "I have written you a great many times about these differences, but do not seem to get any direct results from them other than, 'will make it all right in the end,' but there is so much to be made right that I think we ought to have an understanding now," will show that on that date no definite oral agreement had been made.

On his direct examination the plaintiff's attention was called to the language thus employed, and he was asked by his counsel:

"Now, I wish you would tell the jury what conversations you had with Mr. Supple wherein he told you he would make it all right in the end, if any."

The witness replied:

"Well, we had numerous conversations relating to differences in the way the material was being delivered, and what I had anticipated and what the contract to my ideas called for; but Mr. Supple would not come right down to anything. He would always be sort of evasive and say he would look it up, and make it all right, and see that I didn't lose anything, and that kind of talk.

"Q. Now, along in June, down on the works, did you have a conversation with Mr. Supple?

"A. I had several. I had one I remember in particular, in the early part of June; but it was all to the same purport, complaints of methods of delivery and condition of the stuff as delivered and the poor work that was done.

"Q. What did he say, if anything?

"A. He promised that he would make it all right; to stop kicking and he would see that it was all right.

"Q. See that what was all right?

"A. Why, I suppose the remuneration; that is what we were talking about.

"Q. Remuneration to whom?

"A. To me, I suppose; there was nobody else interested.

"Q. And for what?

"A. For the building of the dredges.

"Q. Did you then go ahead and build them?

"A. Yes, I went ahead and built them under protest right from the start, objecting at all times from the start about the time, and explained to him that the prolongation of the delivery was working a serious hardship on me; that wages were going up all the time; and that the men I had who would stay by me

and knew me were all drifting away one at a time, and then had to be replaced by somebody else.''

The testimony shows, however, that the only exact promise made by the defendant was to the effect that if he made any money by building the dredges, and the plaintiff lost any, in performing his part of the agreement, Supple would aid Wakefield. Thus Mr. Supple, as a witness, was directed by his counsel:

''Tell the jury what conversation you had with Mr. Wakefield over extras or over this contract in which he said something about suing you, and when was that?''

The defendant replied:

''Well, that was along, as near as I can remember, about four weeks or so before I paid him the last payment. He said he guessed he would have to sue me. He says, 'Well, Joe, you are going to make a whole lot of money off of this.' We were both standing out there, and I think Mr. Clark was standing there, and he [the plaintiff] says, 'I am losing money on it, and I think I will have to sue you.' He had told me that before. I said 'Well, Mr. Wakefield, if you will push this thing along, and I make any money off this job, and you don't, I will help you out.' Now, that is what I said to him. * *

''Q. What did he say then?

''A. He said, 'All right, we will let it go at that.' ''

This testimony is corroborated by that of C. M. Haight, who quoted Mr. Wakefield when the latter on September 24, 1913, referring to the adjustment of what he considered unusual amounts with respect to constructing the hulls of the dredges, said:

''But, Joe, you don't think for a moment that I ought to pay for all these extra bills?

''Q. Whom did he mean by 'Joe'?

82 Or.—39

"A. Mr. Supple. Mr. Supple sat right across the table from Mr. Wakefield, and Mr. Supple says, 'Well, you go ahead and rush this work through, and I don't know but what I am going to be at a loss the way the work is dragging on; and when the work is finished, if I have made any money and you show you have lost money, I will make it right with you.'"

Assuming, without deciding, that such a promise is enforceable, the testimony as to the avails received by the defendant under the terms of his contract with the Portland Iron Works to build and finish the dredges, except to furnish and install the machinery, shows that he lost money in complying with the terms of his agreement. The defendant, speaking of this matter and of Mr. Wakefield, testified as follows:

"Now, I didn't suppose I had to help him out, or I didn't owe him anything; but I would divide up with him; I would help him out if I made anything and he didn't. * *

"Q. Did you make anything, or did you lose?

"A. I am out over $13,000 in hard-earned money. I didn't get it out of any extras there either; and all through their fault with dilly-dallying along with the work.

"Q. What was the reason?

"A. Because they [the plaintiff and his employees] did not push the work ahead. They misrepresented the thing to me; said they had tools and men and everything and they would push this thing right along, and they only had a few tools and nothing like men enough to build a boat one quarter the size of either one of those in any kind of time. If they had done the work, I would have come out all right.

"Q. What does this $13,000 consist of, this loss? Is it what the government holds back?

"A. It is money I paid out, and the most of it is money that the government took from me at a hundred dollars a day, because I could not get them to do anything. I could not get the work along."

A. F. Tarilton, the defendant's bookkeeper, was asked:

"Do you know whether or not Mr. Supple made or lost money on this contract—yes or no?
  "A. He lost money.
  "Q. State if you know what his loss was. * *
  "A. It is $15,366.98."

The defendant testified that Mr. Ballin was to have received compensation for supervising the construction of the hulls of the dredges if any money had been made under the contract with the Portland Iron Works, and this witness further stated upon oath that he so informed the plaintiff before the latter subscribed his name to the agreement.

Mr. Ballin also testified that he made no misrepresentation to the plaintiff, but informed him generally of the nature and extent of the work required to be performed, and delivered to Mr. Wakefield a set of the completed plans before the contract was consummated.

3. An examination of the testimony convinces us that the written contract was never modified by any subsequent oral agreement; that the evidence received on this branch of the case was insufficient to be submitted to the jury as tending to establish the averment of the complaint in this particular; and that no error was committed in setting aside the verdict and judgment.

It follows that the order of the court complained of is affirmed.            AFFIRMED.   REHEARING DENIED.

MR. JUSTICE BEAN, MR. JUSTICE BENSON and MR. JUSTICE MCBRIDE concur.