**LEASE et al. v. CORVALLIS SAND & GRAVEL CO. et al.**

No. 12435.

United States Court of Appeals
Ninth Circuit.

Nov. 28, 1950.

Wilbur, Beckett, Oppenheimer, Mautz & Souther, E. K. Oppenheimer and Arno H. Denecke, all of Portland, Or., for appellants.

Koerner, Young, McColloch & Dezendorf, James C. Dezendorf and Alfred H. Corbett, Portland, Or., Mark V. Weatherford, Albany, Or., for appellees.

Before MATHEWS,* HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

In May, 1947, the appellants Lease and Leighland, entered into a contract with the Oregon State Board of Higher Education, for the construction by them of a women's dormitory at the Oregon State College at Corvallis, all in accordance with the plans and specifications and other contract documents referred to in the agreement. Lease and Leighland then entered into a subcontract with the appellee John H. Gallagher, Inc. whereby the latter agreed to furnish the ready mixed concrete required by the specifications. The latter agreed to deliver the concrete at the job for a unit price of $9.50 per cubic yard. (A provision for increasing or decreasing the price should bulk cement prices increase or decrease pending the performance of the contract, is not material here.)

John H. Gallagher, Jr. was managing officer of both appellees, John H. Gallagher, Inc. and Corvallis Sand and Gravel Company, Oregon corporations. The appellants, Lease and Leighland, are citizens of the State of Washington.

The sub-contractor appears to have proceeded under its contract sometimes in the name of John H. Gallagher, Inc., and sometimes in the name of Corvallis Sand and Gravel Co. For the purpose of this opinion the two appellee corporations will be considered as a single entity as they appear to have been regarded by all of the parties through the period here involved.

The action below was one brought by the appellees, for convenience here called Sand and Gravel Company, against appellants and the sureties on their construction contract, to recover an amount alleged to be due them in excess of the amount stipulated in the contract. Appellees asserted that during the progress of the contract they were required by Lease and Leighland to furnish quantities of cement in excess of that called for by the contract. They sought to recover the reasonable value of the excess cement so furnished. Appellees recovered a judgment substantially as prayed for.

Appellants assert that the trial judge, before whom the case was tried without a jury, was in error in finding that the Sand and Gravel Company had been called upon to furnish cement in excess of the quantities required by the contract. They also say that in any event the court's calculation of the amount and value of the cement alleged to constitute an extra was erroneous and unwarranted by the evidence.

The specifications did not list the proportions of the materials such as sand, gravel, water and cement required to make the concrete, but specified that the concrete should be such as would be found on application of standard tests to be sufficient to withstand certain designated pressures. The relevant specifications provided:

"804-1a. All cast in place concrete shall have a minimum ultimate 28 day compressive strength of 2500 pounds per square inch. * * *

"804-2b. Proportions of the materials and water content for the concrete strengths shall be established by tests which shall be made in advance of the beginning of operations, using the consistencies suitable for the work and in accordance with the Standard Method of Making Compression Tests of Concrete, ASTM Serial Designation C39-44. At least four test specimens shall be made for each strength of concrete and should show an ultimate strength of at least 15 per cent greater than the strength specified. No substitution shall be made in the materials used on the work without additional tests in accordance herewith to show that the quality of the concrete is satisfactory.

"804-2c. All concrete tests shall be made by an established testing laboratory approved by the Architect. The Contractor shall include the cost of the tests in the contract sum.

"804-2d. During the progress of the work compression tests shall be made in accordance with the Standard Method of

---

* Judge Mathews did not participate in the decision of this case.

Making and Storing Compression Test Specimens of Concrete in the Field, ASTM Serial Designation C31-44. Each test shall be made on one laboratory control cylinder and one field control cylinder. There shall be at least one test for each strength of concrete placed on any one day and at least one test for each 250 cubic yards of concrete or fraction thereof on the job.

"804-2e. The standard age of tests shall be 28 days, but 7 day tests may be used provided that the relation between the 7 and 28 day strengths of the concrete is established by test for the materials and proportions used.

"804-2f. In all cases where the average strength of the laboratory control cylinders shown by these tests for any portion of the structure falls below the minimum ultimate compressive strengths called for on the plans, the Architect shall have the right to order a change in the mix or in the water content for the remaining portion of the structure. In cases where the average strength of the cylinders cured on the job falls below the required strength, the Architect shall have the right to require conditions of temperature and moisture necessary to secure the required strength and may require load tests to be made on the portions of the building so affected."

It will be noted that the important section of these specifications is 804-2b, for it prescribes how the required concrete strengths are to be established. Hence, it is necessary to understand the meaning of the term "Standard Method of Making Compression Tests of Concrete", used in that paragraph, but not there defined except by reference.

The evidence shows that such tests are made upon test specimens of concrete cast in cylinders six inches in diameter, 12 inches high, and allowed to "cure" or "set" for 28 days, when concrete is deemed to reach maximum strength. They are then broken through application of pressure, and the pounds of pressure per square inch required to break the cylinder constitutes the measure of its strength. This is stated in terms of pounds per square inch, abbreviated, p.s.i.

The tests may also be made after 7 days, and from the result then obtained the probable result at 28 days can be estimated, once a conversion factor has been ascertained by experiment. Thus, if a conversion factor of 1.5 is determined, it signifies that it has been ascertained that the particular concrete will probably attain at 28 days 1.5 times its strength at 7 days.

Tests are "field tests" or "laboratory tests". When cast and hardened in the laboratory, the cylinders are kept at constant and ideal temperatures and moistures, and hence such test specimens are apt to disclose greater strength than field cast specimens of the same "mix". This is the reason for the requirement, stated in section 804-2b, that such tests disclose strengths 15 per cent greater than the strengths specified. It is to assure a margin of safety for the concrete poured in place.

Although the proportions of the materials for the concrete strength were to be established "by tests which shall be made in advance of the beginning of operations", as provided in § 804-2b quoted above, it was determined, apparently with the consent of all parties, and certainly without objection from any of them, that the pouring of the concrete should start about July 1, 1947, and at a date before such advance tests had been made.

Upon commencing operations the Sand and Gravel Company procured the advice and assistance of a Professor Thomas of the Oregon State College School of Engineering, who appears to have been in charge of that school's engineering laboratory. He undertook to aid in making up recommended proportions of materials calculated to meet the compressive strength standards called for by the specifications.

The Sand and Gravel Company continued to furnish concrete, mixed in accordance with the recommendations received by it from time to time from Prof. Thomas, until September 23, 1947, when it received a letter from Lease and Leighland requiring it thereafter to use not less than

5 sacks of cement in each cubic yard of concrete. Immediately prior to the receipt of this requirement, with which it proceeded to comply, the Sand and Gravel Company was using 4⅔ sacks. It now claims that concrete of the required strength could have been produced with less than 4 sacks per cubic yard; that the 5 sacks requirement was in excess of its contract obligations, and that it should therefore be paid for the excess cost of compliance.

It should be noted that the recovery sought relates only to that part of the contract performed after the September 23 date mentioned.

On July 21, 1947, shortly after pouring commenced, Prof. Thomas recommended to the Sand and Gravel Company proportions of materials, or a "mix", calling for five sacks of cement per cubic yard; on August 7, he recommended a somewhat different mixture of sand and gravel but also recommended the continued use of five sacks of cement per cubic yard. On August 12, he again varied his formula, recommending 4⅔ sacks per cubic yard. On August 26, he reported the results of five laboratory tests of concrete used on the job. In the main these were based on the seven-day tests and the test made from concrete poured on August 13, (which was the day following the reduction of the proposed cement content from 5 to 4⅔ sacks) showed a markedly unsatisfactory and insufficient strength. On August 22 he reported two 28-day tests, one a laboratory test showing 2560 p.s.i. and a field test showing 2210 p.s.i. The general contractor and the architect received copies of these reports, and the architect on August 26 wrote to the general contractor calling attention to section 804-2b of the specifications, stating that the frequent changes of mixtures were not warranted by the specifications and that 20% of the tests showed the concrete strengths below the minimum requirements of the contract. The information given was that all future pourings must be in accordance with the specifications or the work would not be accepted.

Two days later, the architects elaborated on their communication, reviewed the correspondence between Prof. Thomas and the Sand and Gravel Company and his changing recommendations, and particularly analyzed the relation between the 7 and 28 day tests, and advised that the results disclosed a conversion factor of 1.58 between them.

On August 29, Lease and Leighland wrote to the Sand and Gravel Company advising them of the architect's complaints, called attention to the fact that some of the 28 day tests showed concrete below the minimum requirement, and stated that: "* * * if steps are not taken at once to bring this material up to requirements, it will result in one of two things, which are as follows: (1) A work stoppage until a new mix is designed and four test specimens made which shall show an ultimate strength of at least 15% greater than the strengths required. (2) The removal and replacement of the portions of the building where the concrete does not meet requirements. As contractors, we know we cannot afford to have either of these things take place, and we certainly feel that you would take a similar stand. We, therefore, trust that you will take steps immediately to eliminate this uncertainty which has prevailed since we started placing concrete on this job, June 30, 1947."

The upshot of all this was that all of the interested parties met on September 3 and reached an agreement the effect of which was summarized in a letter written to the Sand and Gravel Company by Lease and Leighland as follows:

"Corvallis, Oregon
September 9, 1947

Corvallis Sand & Gravel Company
Corvallis, Oregon
  Ref: Women's Dormitory
  Sub: Concrete
Attention: John H. Gallagher, Jr.

Gentlemen:

As a result of the meeting between the Contractor and the Architect, September 3, 1947, at which you were also present, we wish to confirm the verbal decision, as follows:

1. The O.S.C. Engineering Materials Laboratory supervised by Professor C. E. Thomas is acceptable to act as the concrete testing laboratory required by the job specifications and the laboratory will prepare a mix and make four test cylinders.

2. Two of the test cylinders will be used for 28-day testing and must not be less than 2500 plus 15% or 2875 p.s.i., and the other two cylinders will be broken at 7-days and shall be not less than 2875 p.s.i. divided by the agreed upon factor of 1.58 or 1820 p.s.i. This factor of 1.58 was agreed on by Prof. Thomas and Stanton and Johnston September 3, 1947.

3. The mix for all future concrete as determined by the laboratory shall be approved by the architect before it is used on the job. Tentative approval by the architect will be based on the results of the 7-day tests.

4. No substitutions shall be made in the concrete materials used on the work without additional tests as specified in Article 804-2b and 804-2c.

5. During the time necessary to obtain the 7-day results of the first laboratory mix, the contractor shall use a mix as designed by the O.S.C. Laboratory and approved by the Architect.

As the supplier of concrete for this job, we will expect you to work in strict accordance with this decision.

> Yours very truly,
> Lease and Leighland, Lee E. Woods
> Superintendent."

The accuracy of the statements made in the quoted letter are nowhere controverted. The current correspondence of the Sand and Gravel Company referred to the general purpose of the September 3 agreement.[1] The letter of September 9, quoted above, was produced as an exhibit at the pre-trial conference and is listed as an exhibit in the pre-trial order. It was introduced as an exhibit at the beginning of the trial, and although Mr. Gallagher, Manager of the Sand and Gravel Company, was thereafter called as a witness, yet no inquiry was made of him with respect to the subject matter of that letter, although he testified that he was present and attended the meeting when the formula or mix was discussed.

Mr. Lease thereafter testified on behalf of the defendants, and stated in substance that what transpired at the September 3 meeting was as set forth in defendant's letter of September 9. No one undertook to deny this.

It is apparent that the arrangements made at the September 3 meeting were significant in view of the provisions of the specifications. Here for the first time "the established testing laboratory" mentioned in § 804-2c was agreed upon, and Prof. Thomas' laboratory was designated for the purposes of the contract. The tests which § 804-2b contemplated should be made in advance before any concrete was delivered, were now to be made. The results were to determine the mix for all future concrete.

Four such tests were to be made. It was specifically stated that they should disclose the 15% greater strength called for in laboratory tests as originally specified in § 804-2b. The conversion factor for converting 7 day tests into comparable 28 day strength was agreed upon as 1.58. During the interim and until the results of the four tests could be reported, the Sand and Gravel Company was to follow directions of Prof. Thomas as to the proper mix.

Following the September 3 agreement, the parties proceeded to carry through as there agreed upon. On September 3, Prof. Thomas advised the Sand and Gravel Company that "pursuant to the general agreement reached in conference this morning with the representatives of Messrs. Stanton and Johnston, [the architects] and with

---

1. Thus the Sand and Gravel Company's letter to Lease and Leighland dated September 3, 1947, contained a first paragraph as follows: "We have your letter of August 29th, with your recommendations regarding the concrete for your job. We understand that the prevailing conditions indicated in your letter have been settled to a satisfactory degree as indicated in the conference with the architects and ourselves today."

Messrs. Lease and Leighland, I have prepared the proportions of concrete. * *" The recommended mix called for $4\frac{2}{3}$ sacks of cement per cubic yard. This letter was amended by him on September 5 in certain particulars not affecting the quantity of cement.

On September 19, Prof. Thomas reported the results of the first two cylinder tests on the two specimens tested at 7 days pursuant to the September 3 agreement. These showed a strength of 1614 and 1620 p.s.i. respectively. As these batches had been made up using $4\frac{2}{3}$ sacks of cement per cubic yard, and as the test cylinders fell short of the 1820 p.s.i. required by the September 3 arrangement, the architects on September 22 wrote to Lease and Leighland calling their attention to the insufficiencies disclosed by the tests and stated: "Pending results of the 28 day tests, you are hereby required to increase the concrete content of this mix to 5 sacks of 470 pounds per cubic yard. No other changes to the mix are required or allowed." It was in response to this requirement of the architects that Lease and Leighland wrote the letter of September 23 previously mentioned and out of which this controversy has arisen.

The evidence also discloses that on October 2, 1947, Prof. Thomas reported a further laboratory test made at 7 days on what was apparently a mix based on $4\frac{2}{3}$ sacks per cubic yard. It showed only 1423 p.s.i. On October 8, 1947, Prof. Thomas reported the results of his 28 day tests made pursuant to the September 3 understanding and stated that "I am now in a position to make a formal recommendation for the concrete mix to be used in the construction of the women's dormitory."

Attached to his report were the results of the two 28 day laboratory tests made with what he stated was a cement factor of 4.7 sacks per cubic yard. Both fell short of the 2875 p.s.i. referred to in the September 9 letter, averaging 2780 p.s.i. His determination as to the required mix, insofar as cement factor is concerned, is contained in the first two paragraphs of his October 8 letter as follows: "The 28-day tests on the designed concrete having

been made, I am now in a position to make a formal recommendation for the concrete mix to be used in the construction of the Women's Dormitory. I understand from Mr. Timian that recently concrete has been poured containing 5 sacks per cu yd, and in view of the results reported on the attached data sheet, and in consideration of other factors involved, it seems best to make no change in that cement factor at this time. You will recall that I recommended in Report No. 308-RT-j (September 19) that the mix contain 4.7 sacks per cu yd. The test results indicate that when adjusted to a minimum strength of 2875 p.s.i. the cement content would need to be 4.82 sacks per cu yd. This, however, is based upon a slump of 3 inches, and inasmuch as you find it necessary to run a higher slump more or less frequently, and inasmuch as lower pouring temperatures may now be encountered, it would seem desirable to round this cement factor up to 5 sacks per cu yd."

It should be noted that in issuing his directions of October 8, Prof. Thomas was acting for and on behalf of the "established testing laboratory" designated pursuant to the specifications of the contract. Under § 804-2b the Sand and Gravel Company was obliged to furnish concrete in the proportions which were indicated by tests derived from four test specimens made by such a laboratory.

Had the provision of § 804-2b been literally complied with the 4 test specimens mentioned therein would have been checked through tests "made in advance of the beginning of operations", that is to say, prior to July 1, 1947. This was not done and the requirement that the test be made in advance was waived by all the parties. After commencement of the work the Sand and Gravel Company, with the aid of Prof. Thomas, proceeded to pour concrete with a mix varying from week to week and arrived at by a sort of trial and error method. Following the demand made on August 29 by Lease and Leighland that the Sand and Gravel Company do something to meet the architect's demand for an improved product, the parties held their Sep-

tember 3 meeting for the purpose of working out their future operations.

It is the contention of appellees that the requirement of § 804-2b for tests showing an ultimate strength of 15 per cent more than that specified has no application here for the reason that such per cent increase was required only in the tests preceding or "in advance of the beginning" of operations. Its contention seems to be that since no such preceding tests were made, the 15 per cent requirement is irrelevant in this case. This view seems to have been adopted by the trial judge.

The appellants assert, on the contrary, that while the time for making the tests called for by § 804-2b was waived, the making of the test specimens to meet the 15 per cent safety factor requirement was still obligatory upon the Sand and Gravel Company.[2]

■■ Any uncertainty as to which of these two views represents the proper construction of the contract was resolved and settled by the agreement of the parties at their September 3 meeting. The understanding there arrived at and expressed was reasonably consistent with this paragraph of the specifications. It was there agreed that the four test specimens mentioned should now be made and tested as soon as possible, and that further performance under the contract should be in accordance with the results of such tests, the College laboratory being designated to make the tests and to determine the mix, as provided in §§ 804-2b and 804-2c.

We think that this September 3 agreement which the parties proceeded to follow and carry into effect was an interpretation given by the parties themselves to their contract which a court should adopt. Williston on Contracts, 3d Ed. § 623; Restatement of Law of Contracts, § 235e.

As stated by the Supreme Court of Oregon, Kontz v. B. P. John Furniture Corp.,

167 Or. 187, 115 P.2d 319, 325, "The practical interpretation of the terms of a contract made by the parties while performing it is universally deemed a safe guide to the intended meaning of the instrument."

■ Even if the agreement of September 3d had run counter to certain provisions of the contract, which we think it did not, the rule in Oregon, as elsewhere, is that a written contract may be modified by subsequent oral agreements of the parties in cases such as this. Such has been stated to be the rule in Oregon in respect to construction contracts. Zanello v. Smith & Watson Iron Works, 62 Or. 213, 124 P. 660; Pippy v. Winslow, 62 Or. 219, 125 P. 298; Wakefield v. Supple, 82 Or. 595, 160 P. 376.

Since none of the four test specimens referred to in § 804-2b and in the agreement of September 3 measured up to the stipulated strength, it is obvious that some increase was called for in the cement in the mixture. In other words, the Sand and Gravel Company's agreement to meet the specification required it to increase the strength of the mix to meet the standards called for by these four tests. As soon as the 28-day tests were completed the approved testing laboratory, through Prof. Thomas, made its authorized findings that five sacks per cubic yard were required. This was an end of the matter. It also demonstrated that the architect and Lease and Leighland on September 22 and September 23 made an accurate guess when they made the five sack requirement.

■ The trial court found that "the ready mix concrete prepared and supplied by plaintiffs to defendants Lease and Leighland prior to September 23, 1947, met all of the requirements of the material contract and the 'Specifications for General Construction for Women's Dormitory'". The court also found that: "The require-

2. The Oregon court follows the usual rule that one who has previously waived performance at a stated time, may, as to future performance of the contract, retract his waiver and by notice to the other party reinstate his right to require the future strict compliance with the contract conditions. Samuels v. Mack-International Motor Truck Corp., 128 Or. 600, 607, 275 P. 596, 598. See Restatement, Contracts §§ 297, 311.

ment of the defendants Lease and Leighland of September 23, 1947, that plaintiff Corvallis Sand & Gravel Company use five sacks of cement per cubic yard of concrete effective that day was without contractual or legal justification or excuse."

The judgment of the trial court is based primarily upon these two findings. Neither is essentially a finding of fact. Both are primarily based upon the court's construction of the contract and the specifications. Insofar as they may be said to involve fact determinations, we think they run counter to undisputed writings. Cf. Senato v. United States, 2 Cir., 173 F.2d 493.

■ We think the facts and circumstances heretofore related sufficiently disclose that these findings are in error. They are apparently based upon a view of the facts and of the law which we think is not warranted. We are of the opinion that it is not of material significance here whether the ready-mixed concrete prepared and supplied prior to September 3 did or did not meet the required standards. The important fact, not in dispute here, is that the four tests made pursuant to the September 3 arrangement and in conformity with the methods stipulated in the specifications for making such four tests, disclosed that the four test specimens were inadequate, whereupon the person authorized to make the tests made his findings of a five sack requirement.

■ While what we have said is sufficient to dispose of the case and to disclose that no cause of action existed, we believe we should further state that in our opinion, even if a cause of action had been proven, there was no evidence upon which substantial damages could be awarded. The damages awarded were based exclusively upon an estimate of damages furnished by the witness, Gallagher, as a part of his testimony. He arrived at his conclusions by adding together the thirteen 28-day laboratory tests made from September 30, 1947 to February 18, 1948, divided the total by 13, and arrived at an average p.s.i. for the 13 tests, which he said averaged 3973 pounds. He computed

this to be 58.92% above 2500 pounds per square inch, and concluded that the 5 sacks used represented a 58.92% excess in cement. The conclusion was that he could have produced the 2500 p.s.i. required with 3.146 sacks, and he demanded pay for the excess 1.854 sacks, which, multiplied by the total number of yards poured after September 23, amounted to 7,787.73 sacks, for which he was allowed 80¢ per sack in the court's judgment.

We think that any such conclusion as that testified to is manifestly impossible. The uncontradicted evidence as to the practical operation of the concrete industry, is that the mixing of concrete is not a precise or exact process. The final results arrived at vary with the amounts of sand in relation to gravel, the size of the gravel, the amount of water, the weather, and the "slump" or settling quality of the concrete. The contract did not call for an average strength, but a minimum strength and no practical contractor would ever find it feasible to perform a contract of this kind with theoretically minimum quantities. If his concrete merely *averaged* the required strength, substantial portions would be below the minimum standard, and he would soon find himself ordered to tear out a substantial amount of his product after it hardened in place. To avoid that possibility he must necessarily allow for a safety factor. In fact, that is precisely what was done by the Sand and Gravel Company. When left to its own devices, it made no attempt to get by with 3.146 sacks or anything like it. It used 4.7 sacks. On September 29, 1947, in writing to Lease and Leighland protesting the latter's statement that it would not absorb any of the added cost of cement, the Sand and Gravel Company said: "Our quotation to you of 2500 lbs. concrete at $9.50 per yard was based on 4.7 sacks per yard. You have changed the quantity of cement in the mixture without arranging for additional compensation, which makes a new contract."

Another false assumption in this estimate of damages is that a reduction of cement quantities would effect only a proportional reduction in concrete strength. Even if it be assumed that the require-

ment of 5 sacks was too much, the record is barren of credible evidence as to whether a practical performance could have been made with 4.7 sacks, 4.8 sacks, 4.9 sacks, or any other amount less than 5 sacks.[3]

We are therefore of the opinion that even if it were assumed that plaintiff had established a breach of contract on the part of Lease and Leighland, this evidence would not warrant a recovery in excess of nominal damages.

The judgment is reversed and the cause is remanded with directions to enter judgment for the defendants. .

---

3. Gallagher testified on cross-examination: "Is it not a fact that when you bid on cubic yards of concrete where you put in inch-and-a-quarter gravel you figure on approximately 5 sacks of cement per cubic yard? A. No. Q. What do you figure? A. I couldn't answer that question."