Argued January 23; reversed February 18, 1941
# ELEY v. MILLER
(110 P. (2d) 587)

Before KELLY, Chief Justice, and BELT, BAILEY and LUSK, Associate Justices.

*George H. Layman,* of Newberg, and *Carl H. Francis,* of Dayton, for appellant.

*Elliott B. Cummins,* of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for respondent.

BELT, J. Plaintiff commenced an action to recover damages on account of the alleged failure of the defendant to convey 1.91 acres of land. The contract of sale and the deed executed by the defendant vendor includes the above tract together with other land owned by defendant, but it is conceded that title to the 1.91 acres is vested in third parties. Plaintiff asserts that, by reason of this alleged breach of warranty, he has been damaged in the sum of $1,750.

Defendant, by answer in the nature of a cross-bill in equity, seeks reformation of the contract and deed on the ground of mutual mistake, alleging in substance that it was never the intention of the plaintiff to purchase nor the defendant to sell the land in controversy.

The cause, under stipulation of the parties, was submitted to the court for decision without the intervention of a jury. From a decree reforming the deed so as to exclude the land in question, the plaintiff appeals.

In June, 1937, plaintiff, then a resident of California, came to Oregon with the intention of acquiring river front property suitable for development. At that time he met Cecil W. Stuller, realtor at Lafayette, Oregon, who showed him defendant's farm in Yamhill county, consisting of 173 acres, more or less, which had been listed for sale.

Reference to the following plat of the southern part of the farm will aid in understanding the issues of the case:

It is observed from the above plat that the 1.91 acres in controversy lie between the old abandoned county road and the re-located highway. This land is owned by a Mr. Wilson and his sister, Mrs. Ramsden, who have homes just across the re-located highway. The true western boundary of defendant Miller's land opposite the tract in question is the old abandoned road, but north of such tract the re-located highway marks the western boundary of the Miller farm. However, in the contract of sale and deed, the western boundary of the land in controversy was described as following the line of the re-located highway.

Stuller was very familiar with the Miller property and the boundaries thereof as he had previously shown it to various prospective purchasers. Stuller said that when the property was shown to the plaintiff they stood at the northern tip of the triangular tract in question—where the old road converges with the re-located highway—and he "explained to plaintiff that the line went to the old road and didn't run out on new highway" and that the land "belonged to some people by name of Wilson".

Eley testified that they followed the highway south from the northwest corner of the Miller land until they reached the northern point of the triangular tract and then Stuller thus pointed out the western boundary: "You look right down this road (referring to highway) * * * and you see some kind of wooden fence, or some mark where it showed would be a draw. * * * This property goes down the middle of the road to that draw."

Stuller and plaintiff went to Miller's home on the farm for noonday dinner. After dinner, Stuller and plaintiff went back to look at the property again, ac-

companied by Miller, the seller. According to Stuller, discussion arose at that time about the strip between the two roads and plaintiff asked Miller to contact the Wilsons and "see if I can't buy that." Stuller also testified that plaintiff said he was willing to pay a nominal sum as it was of no particular value, but that Miller said he could not do much with the Wilsons—although friendly to them—as he had had some "little difficulty with them on account of a dog." Stuller stated that Miller told plaintiff then and there that "My line doesn't follow that fence, but it follows, as Stuller told you, along the old road."

The defendant Miller testified about discussing the western boundary of the land with plaintiff and stated that he told Eley "It goes on to the old road" and that the triangular strip belonged to Wilson. Miller also testified that plaintiff inquired of him if he could buy such strip.

Later, in the early part of August, another inspection of the premises was made and, according to Stuller, "Eley said he still wanted to get that piece if he could."

Mrs. Minnie Long—housekeeper for defendant, who prepared dinner when first inspection of property was made—testified to having heard a conversation between plaintiff and defendant wherein the former inquired if he could not buy the "three cornered tract belonging to Wilsons." Mrs. Long was very positive that this conversation occurred when she witnessed the contract dated August 14. Eley was admittedly in California at such time. Such palpable error on the part of the witness greatly weakens her testimony that the conversation ever occurred.

Plaintiff positively denies that the old road was pointed out to him as the western boundary or that

Wilson was designated as the owner of the triangular tract in question. Indeed, plaintiff asserts that the re-located highway was specifically designated as the western boundary. Plaintiff also denies that he had such conversations concerning his desire to purchase the land at such time from Wilson.

After the second inspection was made, plaintiff returned to California. A contract and an escrow agreement were forwarded to him for execution. In each of these instruments, the western boundary was thus described: "Beginning on the easterly margin of the *relocated state secondary highway* from Salem to Dayton number  *  *  *  thence in a southerly direction on the easterly margin of said relocated highway to the south line of the William Miller Donation Land Claim." (Italics ours.) Plaintiff re-drafted the contract and thus described the land: *"All that property laying between the relocated State Secondary Highway No. 15* and the Willamette River, bounded on the north by the South line of the Daniel Matheny Donation Land Claim and on the south by the South line of the William Miller Donation Land Claim; the property containing 173 acres, more or less. This property to be more properly and fully described in the Deed to be given to the buyer." (Italics ours.) Plaintiff said he thought the description in the contract sent to him covered the land he intended to buy, but that he wanted to so describe it as to avoid any chance of misunderstanding. Plaintiff returned to Stuller the re-drafted contract and escrow agreement executed on his part, and the agent secured the signature of the seller, the defendant herein.

Subsequently, in September, 1937, plaintiff returned to Oregon, had the abstract of title examined by Mr.

Vinton of the law firm of Vinton, Marsh and Marsh, at McMinnville, Oregon, and, upon receiving written opinion approving title, accepted from defendant a warranty deed dated September 15, 1937, in which the land, so far as concerns this appeal, was described as follows:

"Beginning in the center of the county road *now there* known as and being Market road No. 16, said beginning point being the southwest corner of the Daniel Matheny D. L. C. in said county and state; thence running in a southerly direction in the center of said Market road to the south line of the said William Miller D. L. C. * * * (Italics ours.)

No blame is attached to Mr. Vinton by reason of his having approved the title to the land in question, as the abstract failed to disclose when the road referred to in the deed as Market road No. 16 was relocated, such designation having been at one time applicable to the old abandoned road. The plat in the abstract showed only one road.

Plaintiff testified that he first learned on the day after the execution of the deed that his grantor did not own the triangular tract in question. He was looking over the property accompanied by a Mr. McKinley whom he had employed to assist him in its development. McKinley had previously worked for the defendant and was thoroughly familiar with the property. It was on this occasion that McKinley told plaintiff that Miller did not own the land between the two roads and that it belonged to Wilson and his sister.

On the same day, after obtaining such information, plaintiff went across the road to see Mr. Wilson about the matter and undertook to buy the land for a nominal sum rather than, as he says, "have any trouble about it." Mr. Wilson says that plaintiff con-

sulted him on two different occasions about buying the
land but never made any definite offer. Mr. Wilson
testified positively, however, that plaintiff did say
to him "that if I wouldn't sell to him, he would put a
line across there and make Miller take his end back."

Mr. Eley left for California on September 18th.
Asked why he did not protest to Stuller or Miller about
the deficiency of 1.91 acres, plaintiff answered that
Miller was away and that he had no transportation to
go to Lafayette to see Stuller. After returning to
California, plaintiff, on September 23, 1937, wrote a
letter to Stuller containing the following paragraph:

"On that same evening, I also received a call from
a Mrs. Craig, who apparently is one of the sisters of
the Wilson estate, which is located across the road
from my property, she seemed particularly anxious
to see me; so I called on her on Saturday morning
before the train left. She is not the sister *whose por-
tion runs across the road and adjoins my south end.*"
(Italics ours.)

Mr. Eley says that he again consulted Wilson in
December concerning the purchase of this strip and
then went to see Mr. Vinton who told him, "I will ar-
range with Mrs. Ramsden to give you a quit claim
deed." Later, according to the plaintiff, Mr. Vinton
wrote to him saying that Mrs. Ramsden did not want
to dispose of it. .

Mr. Vinton testified that he wrote a letter to Mrs.
Ramsden about the plaintiff's desire to buy this tract
but that he never, at any time after the discovery of
the mistake in the description, told Mr. Eley he was
entitled to the tract "unless he could buy it from the
Wilsons and Ramsdens." There is no real dispute
between Mr. Vinton and Mr. Eley. When Mr. Eley
saw Mr. Vinton in December it was known that a mis-

take had been made by Miller in contracting to sell something he did not own. It is entirely reasonable to believe that Mr. Vinton was willing to co-operate with Mr. Eley in undertaking to get a deed from the Wilsons and Ramsdens if the same could be had for a nominal sum. Mr. Eley did not testify that Mr. Vinton told him he was entitled to have the tract in question without paying anything therefor.

Mrs. Ramsden testified that, in the latter part of January or the first part of February, 1938, Mr. Eley consulted her about buying the land in question. Eley said that he saw Mrs. Ramsden in December about buying her interest in the land and we think this is probably the correct time.

No charge of fraud or bad faith is made against any party in this proceeding. It is fair, therefore, to assume a mistake on the part of the defendant vendor. Certainly Miller, if he was acting in good faith, did not undertake to sell land which he did not own. He knew the boundaries of his land and it is highly improbable that he would orally designate the re-located highway as the western boundary of the strip in question. Since no charge of fraud is made against Stuller, we may also assume that he acted in good faith and would not intentionally misrepresent the true boundary of the land.

██ Mistake by the vendor alone would not justify reformation. The mistake must be mutual. There is a strong presumption that the contract and deed express what the parties had in mind, and the burden of overcoming such presumption rests upon the party seeking reformation. It is incumbent upon him to establish by clear, satisfactory, and convincing proof that the deed purporting to convey the tract in ques-

tion is the result of mutual mistake: *Brown v. Briggs,* 134 Or. 184, 292 P. 1034, and numerous authorities from this court cited therein. If the rule were otherwise, there would be slight certainty and stability in written contracts.

The vital question is whether the plaintiff buyer knew that the triangular tract was not to be included in his purchase of the Miller farm. The old county road had not been used for ten years or more and was at such time overgrown with brush. It is quite reasonable to suppose that plaintiff would not know of its existence unless his attention had been specifically directed thereto. It is also reasonable to assume that the plaintiff would conclude in the absence of knowledge to the contrary, that the present highway marked the boundary of defendant's land to the south line. Of course, if plaintiff was specifically told that defendant did not own such tract, there would be no occasion to indulge in such assumptions.

We confess that we are not entirely able to reconcile the claims of plaintiff with his conduct after learning that defendant did not own the small tract between the two roads. Ordinarily, the buyer would immediately protest to the seller or his agent. It is apparent, however, that Eley still hoped to acquire the interests of Wilson and his sister for a nominal sum and thereby avoid trouble. When he did learn that title to the tract could not thus be acquired, protest was made to Mr. Vinton and to Mr. Stuller.

It is urged that the letter written by plaintiff to Stuller on September 23d wherein it is stated, ''She (Mrs. Craig) is not the sister whose portion runs across the road and adjoins my south end'' is inconsistent with the contention of plaintiff that he intended to

buy the tract in question. At the time this letter was written, plaintiff knew that defendant did not own such tract. We see no inconsistency in such statement of fact. Plaintiff, at such time, was waiting for a reply from the Wilsons and probably thought there was no need of then making any protest. The statement which plaintiff made to Wilson about making Miller "take his end back" if Wilson would not sell is highly significant.

We have said it is difficult to fully reconcile the conduct of the plaintiff subsequent to learning that defendant did not own the tract between the two roads with his present contention. It is also difficult to understand why defendant executed the contract of sale wherein the land was described as "All that property laying between the relocated State Secondary Highway No. 15 and the Willamette river", if there was so much talk prior thereto about the triangular tract in question. The language is plain and unambiguous. We can attribute such mistake only to carelessness and negligence.

Mr. Miller, the seller, testified on cross examination as follows in reference to execution of the contract of sale:

"Q. Did you read that agreement before signing it? A. Yes.

\*     \*     \*     \*     \*     \*     \*

"Q. Now, I would like to ask, Mr. Miller, that you explain how it was that when you were so particular, as you testified that you were, to tell the agent that you didn't own this strip of land, and when you were so particular to point it out to Mr. Eley, that you didn't own that piece of land, then how is it that you were willing to sign a document specifically contracting to sell all the property between the re-located highway and the river? A. It said all I owned, don't it?

"Q. No, it said all the property lying between the re-located secondary highway and the river. A. Well, I figured what land I never owned, I couldn't sell it, and when I showed him where the line was, I thought that was all right.

"Q. You weren't so particular about what you were signing on paper. When you made a written contract to sell land, you weren't so particular about what you said in that contract? A. Oh, yes. I have always been particular not to sell anything that didn't belong to me.

"Q. Then why were you willing to sign a contract covering all the land between the re-located highway and the river? A. Well, it's just like this. I probably didn't notice that little particular quick concerned in there. As a matter of fact, I probably was a little ignorant and didn't understand the legal phraseology.

"Q. Well, this is simple language, 'all the land between the re-located state highway and the river.' A. Yes.

"Q. You were very particular in your oral conversation? A. Yes.

"Q. But you weren't so particular in your written contract. A. Well, I suppose you could take me on that. I always supposed in our language when you only had so much to sell, you couldn't sell any more, and when you told a man orally that was the way it would be."

■■ After careful study of this record, we conclude it has not been established by clear, satisfactory, and convincing evidence that the plaintiff knew the 1.91 acre tract was not to be included in the purchase of the Miller farm. In other words, we think it has not been established with sufficient certainty that a mutual mistake occurred in the execution of the contract of sale. Mere preponderance of the evidence will not suffice. As stated in Pomeroy's Equity Jurisprudence

(4 ed.), § 859, and quoted with approval in *Miller v. Miller*, 120 Or. 484, 252 P. 705:

"Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error."

The decree granting reformation is reversed and the cause remanded with directions to determine the amount of damages sustained by plaintiff by reason of the failure of the defendant to convey the tract in question.

Plaintiff is entitled to costs and disbursements.