Argued May 22; reversed July 15; objections to cost bill overruled
September 16, 1941

## KONTZ *v.* B. P. JOHN FURNITURE
## CORPORATION
(115 P. (2d) 319)

Before KELLY, Chief Justice, and RAND, BAILEY, LUSK and ROSSMAN, Associate Justices.

*Edward A. Boyrie,* of Portland (Layton & Boyrie, of Portland, on the brief), for appellant.

*Moe M. Tonkon,* of Portland, for respondent.

ROSSMAN, J. This is an appeal by the defendant from a decree and a judgment in favor of the plaintiff, both entered in this cause. The decree dismissed that part of the defendant's answer which sought a reformation upon averments of mutual mistake of the written contract upon which the complaint was based. Later the judgment was entered; its amount is $9,915.27. The plaintiff is the trustee of the estate of Fashion Flow Corporation, a bankrupt. The defendant is a manufacturer of furniture. The purpose of the action was to recover judgment for the sum of $17,837.40 which the complaint alleged remained due to the Fashion

Flow Corporation as an unpaid balance of commissions earned by it while acting as sales agent for the defendant pursuant to a contract signed June 22, 1937. The answer admitted that the defendant signed the writing and that the Fashion Flow Corporation, pursuant to the contract, sold furniture manufactured by the defendant, but among other things sought reformation of one of the provisions of the contract which affected the amounts payable by the defendant to its agent.

. Before making a further statement of the issues, we shall mention some of the facts. The record is virtually free from contradictory evidence. Prior to June 22, 1937, W. L. Swearingen and F. M. English were in the employ of the defendant in its sales department. T. P. Coyle was in some manner associated with them. In 1936 the defendant placed upon the market bedroom furniture of a distinctive style under the trade name of Fashion-Flow. In the spring of 1937 Swearingen, English and Coyle decided that they would like to purchase the trade name Fashion Flow. That name had been registered by the defendant with the federal commissioner of patents as a trade-mark. Through extensive national advertising and other means it had acquired a value. The defendant had so well established the furniture which it manufactured under that trade-mark that merchants in virtually every city and town in the United States displayed and sold it. The three prospective purchasers planned to market various items of house furnishings in addition to the defendant's furniture under the name Fashion-Flow, if they succeeded in its acquisition.

After Swearingen, English and Coyle had decided that they would like to purchase the trade name Fashion-Flow, Swearingen broached the subject to B. P. John, president of the defendant corporation. Some

conferences followed. In the meantime, Swearingen consulted his attorney, Calvin N. Souther, and had him prepare a draft of the proposed contract. Swearingen presented the draft to John. It was unsatisfactory. More drafts were prepared and submitted to John by Swearingen. Each was in fact nothing more than an option agreement. Then the plan of the negotiators was expanded. It was now planned that the three contemplative purchasers should not only have an option to buy the trade-mark Fashion Flow, but should also agree to sell the defendant's Fashion-Flow bedroom furniture. In the course of these negotiations the parties agreed that the trade name Fashion-Flow was worth $100,000, and that the purchasers should have the privilege of paying that sum in installments. They also agreed that, in the event a contract was effected, the three men should bind themselves to sell $100,000 worth of furniture a month until the entire purchase price had been paid, and that if they chose to do so they could form a corporation and assign the contract to it.

On June 22, 1937, Swearingen, English and Coyle called at John's office and presented another draft of the proposed contract. Besides those four men, T. C. McIntire, vice-president and treasurer of the defendant corporation, was present. It developed that page 3 of the proposed contract was unsatisfactory. Thereupon Swearingen repaired to a typewriter and rewrote the page. Then all signed it. The part of the contract which the defendant alleges needs reformation is on page 3. That page, after binding Swearingen, English and Coyle to sell $600,000 worth of bedroom furniture in every six-month period, stated:

"The terms of sale to customers should be as heretofore, that is, 45% off retail price with actual mini-

mum carload freight allowance, and the party of the first part shall pay to the parties of the second part a commission on all sales amounting to 15% of the net invoice price, which commission shall be payable on or before the 20th day of the month following shipment of the goods, provided, however, that the party of the first part *may retain 2% of said commission* monthly to apply towards payments of the first maturing corporation note. It is also provided that in event that the party of the second part fails to exercise this option that the 2% retained from July 1, 1937, to December 31, 1937, shall become the property of the party of the first part. * * * "

We have written in italics the words which the defendant says need reformation.

Other provisions of the contract granted to Swearingen, English and Coyle an option expiring December 31, 1937, to purchase the trade name Fashion-Flow for $100,000. It granted them, however, the immediate use of the name and bound them to proceed forthwith with the sale of the defendant's furniture. The agreement recited that upon the exercise of the option each of the three men should execute and deliver to the defendant a note for $5,000, payable in two years, or that the corporation which they proposed to form should sign those notes. The balance of $100,000 was to be evidenced by nine notes maturing at intervals of six months. The last note was rendered payable June 1, 1942. Fifty-one per cent of the corporate stock of the purchasers' corporation when formed was to be pledged with the defendant as security for the notes. Another provision of the contract bound the purchasers to continue the program of national advertising which we have already mentioned and stipulated that they "will spend not less than one-third of all commissions for advertising and will support their sales promotion in

every way possible." The contract also provided that if the purchasers formed a corporation and assigned the contract to it, they should be relieved of all of the obligations of the agreement. Other parts of the contract have been mentioned sufficiently in preceding paragraphs.

The part of the contract which the defendant alleges fails to express the agreement reads:

"The party of the first part may retain 2% of said commission monthly to apply towards payment of the first maturing corporation note."

The answer alleges, that "through mutual mistake, inadvertence, omission and oversight on the part of the parties to said agreement and through the mistake of the scrivener" the words "may retain 2% of said commission" were written when the following should has been employed: "may retain 2/15s of said commission."

After the agreement had been signed the parties to it at once proceeded with the discharge of their contractual duties. The Fashion Flow Corporation was created and the contract was assigned to it. Swearingen became its president, English its vice-president, and Coyle its secretary-treasurer. The three also constituted the membership of its board of directors. Only $4,000 of capital was paid in. Coyle was expected to secure further funds, but these expectations were never realized. A Portland office was immediately established. Since the sales duties of Swearingen, English and Coyle required their presence in other parts of the country, Donald E. Kontz, who later became the plaintiff in this action, was employed by the corporation as its office manager. He, however, was not an officer of the corporation. As we have indicated, the option

provision of the contract extended no further than December 31, 1937. However, on that day an extension agreement was signed by the contracting parties which extended the option to March 1, 1938. Before March 1, 1938, the Fashion Flow Corporation was in financial difficulties. February 24, 1938, it notified the defendant that it had terminated, "effective immediately," the agreement. About the same time it proposed to make an assignment for the benefit of its creditors. June 13, 1938, it was adjudged a bankrupt.

We now return to a statement of the issues as revealed by the pleadings. The parties disagree upon the amount of the sales and amount of the credits. These disputes do not concern the amount of the furniture actually sold nor the amount of the payments actually made by the defendant, but arise out of the interpretation or application of the agreement of June 22. The second issue was precipitated by the prayer for reformation of the contract. We have sufficiently stated that issue. The third issue was based upon averments that through mutual mistake the written contract failed to express the parties' agreement; that later the mistake was discovered; that thereupon the parties by mutual agreement modified the contract in such a way that it authorized the defendant to retain 2/15 of the commissions instead of 2% thereof; that the defendant monthly sent to the Fashion Flow Corporation accountings bearing notations of that retention; and that that corporation regularly approved the correctness of the statements. The fourth issue arose out of the fact that when the Fashion Flow Corporation became involved in financial difficulties the defendant, at that corporation's request, paid to its salesmen their salaries ($3,673.14) and took assignments of their claims. Since the Fashion Flow Corporation, within

four months of that time, became a bankrupt, the plaintiff claims that § 68b of the Bankruptcy Act renders it impossible to use these assigned claims as offsets. The fifth issue arose out of the fact that three months after the Fashion Flow Corporation discontinued its national advertising the defendant kept $5,741.95 of the money otherwise payable to that organization. That sum was 5% of the net sales made by the Fashion Flow Corporation three months after the advertising had been discontinued. The defendant claims that it was not required to continue to pay money to its agent for advertising purposes after the latter no longer spent anything for advertising. The sixth issue arose out of the fact that the Fashion Flow Corporation failed to sell monthly an average of $100,-000 worth of furniture. Based upon this default the defendant contended that it was entitled to $75,000 damages. The reply denied that through mutual mistake the written instrument failed to express the true agreement. It alleged that if the instrument did not express the intention of the parties, the error was due to the defendant's fault. It alleged that the defendant was guilty of laches and had become estopped from alleging mistake. It also averred that the failure of the Fashion Flow Corporation to sell the required amount of furniture was due to failure on the part of the defendant to maintain the quality and standard of its products.

The circuit court accepted the plaintiff's version of the total sales and credits and held adversely to the defendant upon the other defenses.

Let us now revert to the evidence. It will be recalled that the total commission payable was 15% of the net sales. McIntire swore that that commission was

"built up on experience that we had had for sales expense under our regular operation, in that the salesmen had received five per cent; there was five per cent to be inserted in the contract for national advertising, two per cent to be retained as a payment against notes or payments as outlined in the option for purchase of the name of Fashion-Flow, and three per cent to be retained for their administrative expense and operating expense." He swore that he read the agreement before he signed it, adding, "It was interpreted to be five per cent for the salesmen, five per cent for national advertising, two per cent to accumulate against the payment of the option, and three per cent for their administrative and overhead expenses." John testified to similar effect. He said, "They were on the basis that we—what usually our costs are in selling merchandise, in advertising, and it was based on five per cent of advertising, two per cent on all sales that would be retained to pay for the Fashion-Flow contract, and the balance goes to the sales organization." He was asked whether in the course of the conferences Swearingen and his two associates discussed the commission "as two per cent of the sales" and replied, "Yes, that was thoroughly understood. It was their own proposition." Swearingen, who some time after Fashion Flow Corporation had become a bankrupt re-entered the defendant's employ, gave testimony similar to that of McIntire and John. He said, "So, as a matter of course, we went to our attorneys and drew up a contract, laying aside five per cent for sales commission to the salesmen and two per cent of the sales to be set aside—" At that point he was interrupted, but continued, "—of the sales to pay off this indebtedness of one hundred thousand dollars." The presiding judge

then asked, "Two per cent of the sales?" and the witness replied, "Yes, sir." At this point Swearingen recapitulated the figures by showing that of the 15% commissions two parts were to be retained by the defendant to liquidate the $100,000 debt; five parts were for direct sales expense; three parts for his corporation's administrative expense; and five parts for national advertising. He swore that during the course of the negotiations John wanted to know how the purchasers would pay the defendant the $100,000 sum and that he (Swearingen) explained that "two per cent of the sales each month would retire that obligation." His attention was then directed to the fact that the contract said "two per cent of commissions", and replied, "Well, that is what it says here, but that isn't what it meant, because two per cent of the commissions wouldn't no more pay off that contract than—." According to him, the means by which the purchasers would eventually pay the $100,000 purchase price was the chief subject of conversation when the contract was signed. Referring to the instrument and his previous testimony that the writing authorized a two per cent of sales retention, he swore, "That was my interpretation and that was what Mr. John thought as far as my explaining it to him."

English, who also re-entered the defendant's employ some time after the Fashion Flow Corporation had ceased operations, swore: "* * * but I do remember it was mutually agreed upon both sides that the Fashion Flow Corporation was to receive fifteen per cent of net sales, five per cent of which was understood by both parties to reimburse the salesmen of the Fashion Flow Corporation, five per cent was to be spent on national advertising, two per cent was to be retained by

the B. P. John Furniture Corporation in retirement of our obligation, and three per cent to the Fashion Flow Corporation.'' He was then asked whether in signing the instrument he understood that it authorized a retention of two per cent of the sales, and replied, ''It is a common term, 'two per cent of commissions', and it was used by both sides in implication of two per cent of sales.'' He further testified: ''It was my understanding at all times that it meant two-fifteenths, * * * two per cent out of the fifteen per cent.'' Shortly he described it thus: ''Make it fifteen different parts. Two parts is to be retained.''

Mr. Souther, who drafted the various forms of the agreement, swore that the first two were mere option agreements and that they contained no provision concerning a retention of money for the eventual liquidation of the purchase price. Finally, a third draft was requested. Concerning the request, the attorney testified: ''Then they brought into my office a typewritten sheet which refers to a two per cent retention against sales commissions.'' By ''they'' he meant Swearingen, English and Coyle. At this point he was requested to read from the sheet. The following is what he read:

''In the event that you exercise your right to the option as of December 31, 1937, the amount remaining unpaid at that time of the original $100,000 shall be evidenced by notes as specified in original draft due for payment in the sum of $10,000 or more each 6 months, the first payment to be made July 1, 1938, with interest on the unpaid balance at 6% per annum until the full amount of such purchase price shall have been paid; with a continuation of the deduction of two per cent against sales commissions to be applied monthly on above mentioned notes. The entire 2% to apply against the first maturing notes.''

He then said that another paragraph of the sheet made reference to the two per cent item. The following is his reading of that paragraph:

"Sales commission of 15% to be established as compensation for merchandise sold and shipped; 2% of this commission to be retained by us to apply against the payment of the $100,000 specified for the name 'Fashion-Flow'."

Having been presented with this sheet, Souther made another draft of the agreement whereby he converted the previous option draft into an option-sales agent agreement. In it he wrote the provision quoted in the fourth paragraph of this opinion. More drafts were later prepared, but in each of them that provision remained unchanged, and, of course, was in the one signed on June 22. Swearingen swore that he hurriedly prepared the typewritten sheet which Souther employed as a basis for the third draft. Souther had never spoken to John, McIntire or any other representative of the defendant. Coyle did not testify.

The record contains no evidence in contradiction or explanation of the testimony which we have quoted from John, McIntire, Swearingen, English and Souther. Since the latter did not know of the defendant's intentions, he made no effort to say whether or not the agreement of June 22 expressed the intention of all the parties to it. The plaintiff's brief concedes that all of the witnesses who testified concerning the intentions of the parties swore that the instrument failed to express their agreement; he expressly refers to "the unanimity of their opinions."

As we have said, Kontz was placed in charge of the Fashion Flow Corporation's office and records when the office was established. When he was given the

employment he was presented with a copy of the agreement of June 22. In August the defendant made a remittance to the Fashion Flow Corporation for commissions earned in July. When the August commissions were paid, McIntire, under a mistaken belief that the required amount of advertising had not been done, deducted $4,120 from commissions. Kontz shortly convinced McIntire that the advertising had been done and on September 20, 1937, McIntire wrote to the Fashion Flow Corporation a letter making the necessary correction. In this letter he stated further:

"We have looked into the contract and find that it provides for a retention of 2%. Your sales for July were $41,186.63, for August $82,400.28, total $123,-586.91. 2% of this total is $2,471.74."

That sum was deducted from the commissions earned when a check was sent. This was the first mention of the 2% item since the contract was signed on June 22. Upon receipt of that letter Kontz spoke to McIntire, stating that "the agreement read 2% of the commissions." According to him, McIntire replied that the contract, when properly interpreted, meant 2% of sales. Kontz admitted that he accepted the check which was sent with the letter of September 20 and all subsequent checks from which had been deducted 2% of sales. Kontz later made four remittances to the defendant, each of which credited the latter with 2% of sales. We quote from one of his statements containing one of these credits the following:

"In your check sent to us approximately around the first of October in the amount of $28.83 you neglected to withhold the 2% which is due you as per the option agreement. This amounts to $3.84."

A check accompanied the statement. Kontz conceded that after his discussion with McIntire following the

receipt of the letter of September 20 all of his book-keeping entries were upon a basis of two per cent of sales retention by the defendant. McIntire, referring to what was said after Kontz' receipt of the letter of September 20, testified:

"Well, he said his interpretation was it was two per cent of commissions. I told him that that was not the understanding when the contract was made nor the understanding with the principals to the contract."

He swore that Kontz never mentioned the matter again. Swearingen testified that after Kontz had received the letter of September 20 he spoke to him (Swearingen) and we now quote from the latter's testimony:

"Well, he said to read the contract, and it said two per cent of the commissions, and he wondered if that was correct, and both Mr. Coyle and myself mentioned at the time that it was not the intent of it to say that at all.

"Q. Did you tell Mr. Kontz that it was two per cent of the sales?

"A. Yes."

Although Swearingen gave the testimony just mentioned, Kontz did not indicate what his employers told him after receipt of the letter of September 20. He admitted, however, that he talked to all three. After conceding that he regularly accepted the remittance checks from the defendant, and that he allowed two per cent of sales when remitting to the defendant, Kontz said:

"Well, it was a question of accepting or—well, we were just forced to all along. We were in such dire financial circumstances that we had to accept that money."

The interpretation of the contract employed in the practice just reviewed was continued until the Fashion

Flow Corporation ceased operations in the latter part of February, 1938.

The above, we believe, is a fair review of those parts of the evidence material to the issue of reformation. It will be recalled that John, McIntire, English and Swearingen, they being the only witnesses who spoke upon the subject, gave an explanation of the calculations which were employed in determining that the rate of commission should be 15% of sales. According to them, 13/15 of the commission was based upon the defendant's experience which showed that 5% of sales was needed to compensate the salesmen; another 5% was needed for national advertising; and 3% was needed to bear the administrative expense of the sales department. To the total of 13% the parties added another 2% in order to assure the defendant of the discharge of the $100,000 debt. Thus, we have a detailed, believable itemization of the 15% commission allowance. No one in any manner contradicted the evidence to which we have just adverted; but if we should conclude that the writing correctly expresses the agreement, we have no explanation whatever of the manner in which the commission rate was computed.

Again, the $100,000 purchase price obligation was payable in semi-annual installments of $10,000 evidenced by notes bearing 6% interest. If sales were maintained at the required volume of $100,000 per month, 2% of sales would produce $12,000 semi-annually. But 2% of the commissions upon that volume of business would yield only $1,800. Since the 2% provision was manifestly intended as a means of liquidation of the debt, the circumstance just indicated is persuasive that 2% of sales was the intended provision.

Not only does the testimony of John, English, McIntire and Swearingen remain uncontradicted, but it is confirmed and corroborated by the practical construction which the parties placed upon the questioned words after performance of the agreement was begun. It will be recalled that the defendant, about two months after the contract had been signed, sent to the Fashion Flow Corporation a statement showing a retention of 2% of the July and August sales. Kontz thereupon spoke to McIntire and received an explanation that the words upon which he (Kontz) relied meant 2% of sales. The explanation was not challenged by Kontz and thereupon all of his remittances and bookkeeping entries employed the 2% of sales interpretation of the agreement. When Kontz later spoke to Swearingen and English, McIntire's explanation was corroborated.

■ The practical interpretation of the terms of a contract made by the parties while performing it is universally deemed a safe guide to the intended meaning of the instrument. But the plaintiff claims that the Fashion Flow Corporation was in necessitous circumstances at the above-mentioned times, and that therefore in pursuing the above practice or interpretation the corporation was acting under compulsion. Kontz so indicated, but neither English, Swearingen nor any other witness supported the claim that financial need coerced the Fashion Flow Corporation to adopt its construction of the questioned words. Rather, all indicated that that concern's interpretation of the questioned language was employed because that was the original intention. English and Swearingen concede that their company was badly in need of funds by January of 1938, but Swearingen, in spurning Kontz' suggestion that the contract required nothing more than 2% of commissions, said, "Trying to juggle a few

figures wasn't going to save us like volume was going to save us.'' Moreover, it will be recalled that McIntire deducted $4,120 in September under a mistaken belief that the Fashion Flow Corporation had done no advertising. That deduction was made at about the same time that the 2% of sales retention was made. Kontz at once spoke up. Coercion did not hold him back, and a correction was made. This circumstance is at variance with the claim of compulsion. We do not believe that need for money caused the officers of the Fashion Flow Corporation to acquiesce in the defendant's construction of the questioned language. In our opinion, they employed the ratio of 2% of sales because they had intended the contract to so state when it was written.

The plaintiff, in asking that the testimony of English and Swearingen be rejected, calls attention to the fact that some time after the Fashion Flow Corporation was adjudged a bankrupt those two men re-entered the employ of the defendant. He argues that, therefore, they were interested witnesses; but when those two men, while they were officers of the Fashion Flow Corporation, deemed the contract to mean 2% of sales, they had no interest in the defendant. They had separated from it. In employing that interpretation they were acting against self-interest.

The construction of the contract which deemed its meaning to be 2% of sales was employed during the entire course of operations under it; that is, from July 22, 1937, to March of 1938. Not once was a deviation made from the practice. The first insistence upon literal interpretation of the words of the contract came after the plaintiff had been appointed trustee, but previously, as we have already said, while he was serv-

ing as office manager of the corporation, he was told by Swearingen and English, and possibly also by Coyle, that the words which he now says should be interpreted literally meant 2% of sales.

 A contracting party who seeks reformation of the written embodiment of his agreement must sustain his contentions with evidence having a high degree of cogency. A mere preponderance of the evidence does not suffice. Restatement of the Law, Contracts, § 511, and *Eley v. Miller* (Ore.), 110 P. (2d) 587. But it has also been said that "a subsequent departure from the terms of a written contract by the parties and mutually acquiesced in abrogates the original contract to that extent. A written agreement, except when prohibited by positive law, may be modified or annulled by a subsequent valid oral agreement of the parties." *City Messenger Co. v. Postal Tel. Co.*, 74 Or. 433, 145 P. 657. See also Restatement of the Law, Contracts, § 507. However, we shall not place our decision upon the ground of subsequent oral modification. We quoted the principle embraced in the above language only for the purpose of indicating that by their course of conduct, after performance was begun, the parties clearly indicated that the questioned language meant 2% of sales, (that is, parts) of the 15% (or parts). After John, McIntire, Coyle, English and Swearingen had reviewed in many conferences the defendant's sales expenses and had finally totaled up 15% as the agreed commission rate, it was easy for them, we so believe, to be misled into a belief that the expression "2% of commission" stated what they meant, that is, two of the fifteen units over which they had been pondering so long.

 We are convinced that the evidence shows that through mutual error the words "2% of said commis-

sion" were written when "2/15s of said commission" was intended.

■ From § 504, Restatement of the Law, Contracts, we quote:

"Except as stated in §§ 506 and 509-511, where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby."

The plaintiff argues, however, that the defendant's officers were negligent in having failed to discover the use of the erroneous term. John and McIntire conceded that before they signed the contract they had ample time to read it and that they either read page 3 or heard it read.

■ Section 508, Restatement of the Law, Contracts, says:

"The negligent failure of a party to know or to discover the facts, as to which both parties are under a mistake does not preclude rescission or reformation on account thereof."

The decisions of this court approach the liberality of that rule. *Eley v. Miller*, supra, and *Wolfgang v. Henry Thiele Catering Co.*, 128 Or. 433, 275 P. 33. Manifestly, it is better to relieve a contracting party of the effect of his negligence than to reward the other party to the agreement, who was also mistaken, with a better bargain than either intended him to have. The present instance is free from third parties and innocent purchasers for value. No one changed his position under a belief that the questioned term meant what it

literally said. Likewise, no one will be unfairly prejudiced if this court assigns to the term the meaning which the parties intended. In fact, by overlooking the negligence of John and of McIntire, we can give to the term the construction which both contracting parties employed during the time they proceeded under the contract. But we do not by any means believe that the parties were guilty of any grave fault when they failed to notice that the words which they wrote did not literally express their intention. To the contrary, as already stated, we believe that the error was easy of commission. The trial judge who presided over the trial in the circuit court has a well-merited reputation for exactness, yet in his memorandum decision in which he computed the account so that findings of fact could be prepared, he used the expression "2% commission on sales to be retained . . . . $1,062.26" when he intended "2% of commission." The error is manifest, not only from the result which he announced, but also by the fact that 2% commission on sales would not have been $1,062.26 but $7,219.79. Two per cent of commissions ($53,113.47) would be $1,062.26. Likewise, the findings of fact, presumably prepared by plaintiff's counsel, says: "* * * $1,062.26, representing 2% commission on sales made by the Fashion Flow Corporation." That, too, was an error. The words intended were "2% of commission on sales." Our purpose in reviewing those errors was not to find fault, but to show that mathematical and commercial terms can be readily misused. We conclude that the negligence of the defendant's officers does not bar the defendant from the right to the relief which it seeks.

■ The plaintiff's contentions of estoppel, laches and unreasonable delay are buttressed with substantially

the same argument. Clearly, the contention that the defendant has become estopped from seeking a reformation of the contract is without merit. No one changed his position in reliance upon the literal meaning of the contract. The defendant's delay in seeking reformation is excusable. As long as the contract was being performed both parties construed the questioned term as though it was written as mutually intended. They virtually corrected, rectified or reformed the writing after discovery of their error. Had they placed their words in writing, the present action would not have been filed. It was not until some time after the plaintiff's appointment to his office that anyone sought to take advantage of the error and presented an occasion for involuntary reformation. In our opinion, these contentions are without merit.

We bring the above to a close by stating our conclusion that the defendant was entitled to a decree in harmony with its prayer for a reformation of the erroneous language.

One other of the defendant's contentions requires attention. The answer sought to offset against the plaintiff's demands assigned claims held by the defendant against the bankrupt to the extent of $3,673.14. The defendant came into possession of these claims in the following manner: The Fashion Flow Corporation had in its employ many salesmen. In the latter part of 1937 some salary checks given to these men by the Fashion Flow Corporation were returned unsatisfied by the bank upon which they were drawn. These men had been in the defendant's employ before the Fashion Flow Corporation was formed and, naturally, it desired them to continue in the sale of its products. At this juncture the Fashion Flow Corporation re-

quested the defendant to issue its checks to the men and charge the advance to the corporation. This request was immediately granted. At that time the defendant was not indebted to its sales agent. The men were paid the full amount of their claims. In the following two months the Fashion Flow Corporation made similar requests. In each instance it sent to the defendant a payroll sheet which listed the names of salesmen and the amount due to each. The requests for these accommodations were differently worded, but the December one is illustrative of the others. It follows: "Make out checks for exact amount and charge Fashion Flow a/c. Submit a letter showing total amount charged." The defendant reported to the Fashion Flow Corporation the amounts it paid pursuant to these requests. It is agreed that the total paid was $3,673.14.

The plaintiff relies upon § 68(b) of the Bankruptcy Act which reads:

"A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which * * *; (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use, and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy."

The petition in bankruptcy was filed against the Fashion Flow Corporation May 6, 1938. At least some of the requested payments were made more than four months prior to the day just mentioned, but the assignments were received within that four-month period. The plaintiff's brief says he "relies wholly upon the clear and unequivocal provisions of § 68(b)"; that is, § 108 U. S. C. A. Since the findings of fact state that the

defendant took the assignments with knowledge of the Fashion Flow Corporation's insolvency, we are bound to so believe. It is clear that the assignments were received within the four-month period of time, but that alone does not warrant their rejection as offsets. It must further appear that they were taken "with a view to such use," that is, to use them as offsets against claims held by the bankrupt estate. We quote again from the respondent's (plaintiff's) brief:

"Appellant made these payments and took these assignments solely for the purpose of enabling it to carry on its business without interruption with the same sales force which was then in the employ of the Fashion Flow Corporation. Note the testimony of Mr. McIntire, appellant's Vice-President:

"Q. The principal reason for payment to these salesmen was to keep the setup going so that B. P. John could keep their services and keep the operation going?

"A. Well, these men felt that they should have their money; that they had earned it.

"Q. Now you answer my question, and then we will go on and explain.

"A. Yes.

"Q. That is the reason?

"A. That is one of them."

The above concession made by plaintiff's counsel is clearly warranted by the evidence. The defendant, in making payment of salaries to the salesmen was not prompted by any improper motives. Bankruptcy proceedings upon the part of the Fashion Flow Corporation were not under contemplation at that time. All were thinking of that corporation as a going concern. The defendant was not influenced by any purpose to gain an unfair advantage by making the payments. In fact, by paying the men the entire amount of their sal-

aries, as it did, it could not gain an unfair advantage. Its purpose was to induce the men to stay at work. We observe in the memorandum decision of the trial judge the following:

"As a matter of justice, I would like to allow as a credit the assignment from salesmen amounting to $3,673.16 but these assignments having been made within four months of bankruptcy seems to be void under the bankruptcy statute. The defendant knew at all times and at the time of taking said assignments that the Fashion Flow Corporation was insolvent."

■ It is our belief that the Bankruptcy Act did not prohibit the use of these assigned claims as offsets.

The above, we believe, suffices as a disposition of this cause. We realize that we have not cited and analyzed every authority upon which the respondent relies. All of them and all of his contentions have, however, received careful attention.

The cause will be remanded to the circuit court for disposition in harmony with the above.