Argued September 12, reversed and remanded November 24, 1972

WOODRIFF ET UX, *Appellants, v.* ASHCRAFT ET AL, *Respondents.*

503 P2d 472

548

*Patrick Ford,* Medford, argued the cause for appellants.

*Paul W. Haviland,* Medford, argued the cause for respondents.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

BRYSON, J.

Plaintiffs commenced this suit seeking reformation of a land sale contract to correct a scrivener's error. Defendants, purchasers under the contract, interposed affirmative defenses of laches and fraud. The trial court gave judgment to defendants, finding that plaintiffs had failed to demonstrate a mutual mistake in the price and that plaintiffs' claim was barred by laches and unclean hands. Plaintiffs appeal.

Plaintiffs owned a 15-acre parcel of land fronting on the Pacific Ocean in Curry County, Oregon. In July, 1965, plaintiffs engaged Mr. Charles H. Grayshel, a real estate agent, to sell the property for $80,000. At that time, plaintiffs did not know the number of feet of ocean frontage. Grayshel requested this information and plaintiff and his daughter, using a 100-foot steel tape, measured 810 feet of frontage along the seacliff.

Grayshel invited defendant L. C. Ashcraft to view the property. Ashcraft had been on the property several times in the past, removing logs from the beach and hauling them away over plaintiffs' property. During his inspection, Ashcraft was told by plaintiff and Grayshel that the ocean frontage was 810 feet.

Plaintiffs agreed to sell the parcel to defendants for $75,000 as follows: $2,000 as earnest money; $23,000 upon execution of the contract; and the balance of $50,000 payable in annual installments with interest. Defendants requested that the property be divided into three parcels and sold as such. The parties executed the three separate contracts of sale on November 6, 1965. Soon thereafter plaintiff learned from his accountant that a modification of the contracts would result in a substantial tax saving. The purchasers agreed to the modification, which was not to alter the down payment or their indebtedness. In March, 1966, Ashcraft was informed by his attorney that the ocean frontage was less than 810 feet. When Grayshel asked the buyers to initial the modified contracts they refused, saying that they would sign when plaintiffs made an adjustment in the purchase price for the discrepancy in the ocean frontage. Subsequently, plaintiffs discovered that due to a scrivener's error,

one of the modified contracts reflected a down payment of $920 in excess of the amount actually paid.

The first assignment of error is addressed to the finding of the trial court that plaintiffs failed to sustain their burden of proof on the issue of mutual mistake.

■ The evidence adduced at trial clearly shows that the plaintiffs received a down payment of $25,000, not $25,920. Defendant L. C. Ashcraft stated that he agreed to a $25,000 down payment:

"Q We won't go into the matter of the price. That's already been stipulated to. The amount that was paid was $25,000.00, is that right?
"A That's right.
"* * * * *.

"Q And that it was, in fact, divided into three parcels?
"A I knew it was when we got the three separate deeds, which I—actually not deeds, but contracts—which I had anticipated getting one contract. I mean, I made a $25,000.00 down payment on a $75,000.00 piece of property. I just asked that when the deeds were delivered that they was delivered that-a-way. I mean, this was our agreement."

The trial court also stated, at the conclusion of the trial:

"But I'm satisfied with these matters, factually. First of all, I'm satisfied that there was $920.00 less paid than the contract called for."

The evidence is clear and convincing that defendants made a down payment of $25,000, not $25,920.

Defendants urge that because plaintiffs' agent, Grayshel, committed the error, plaintiffs should be barred by Grayshel's negligence from seeking reformation of the mistake. In *Wolfgang v. Henry Thiele Ca-*

*tering Co.,* 128 Or 433, 275 P 33 (1929), this court discussed at length our rule that negligence alone may not of itself be a sufficient ground for refusing equitable relief if under the facts it appears that the other party will not be prejudiced by the decree.

"* * * '[N]egligence, in order to bar equitable relief in case of mutual mistake, clearly established, must be so gross and inexcusable as to amount to a positive violation of a legal duty on the part of the complaining party.' * * *" 128 Or at 444, 275 P at 36, quoting *Howard v. Tettelbaum,* 61 Or 144, 120 P 373 (1912).

*See also, Kontz v. B. P. John Furniture Corp.,* 167 Or 187, 115 P2d 319 (1941) ; 2 Restatement 977, Contracts § 508.

■ Plaintiffs' negligence, if any, is not of the type to justify a denial of reformation. The trial court's finding in this respect is contrary to the evidence and must be reversed.

Plaintiffs next assign as error the trial court's finding that plaintiffs' suit is barred by laches. Defendants urge that a suit for reformation is governed by ORS 12.110(1) which states:

"(1) An action for * * * any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years * * *."

Oregon has no statute of limitations which deals specifically with a suit for reformation.

ORS 12.110(1) governs actions for relief from tortious conduct.[1] A suit for reformation for mutual

---

[1] ORS 12.110(1) has been referred to as our "tort statute." *See* Owings v. Rose', 262 Or 247, 497 P2d 1183, 1189-90 (1972).

mistake seeks relief from a mistake, and a mistake, when proved, does not involve tortious conduct within the contemplation of ORS 12.110(1). The term "mistake" does not imply dishonesty. The mistake in the contract sought to be reformed showed a total down payment of $25,920 rather than $25,000. This mistake implies some degree of carelessness but it was merely an unintentional error. *Warehouse Willy, Inc. v. Newsday, Inc.*, 10 AD2d 49, 51, 196 NYS 2d 787, 789 (1960). *See* 58 CJS 829-33, Mistake (1948); Black's Law Dictionary 1152-153 (4th ed 1951).

We stated, in *Hanns v. Hanns,* 246 Or 282, 306, 423 P2d 499, 511 (1967):

"* * * While courts in granting relief peculiarly within the power of equity are not strictly governed by the statutes of limitations for analogous cases at law, nevertheless such statutes are generally applied by analogy, where laches is asserted. * * *"

We have not heretofore decided the analogous statute of limitation to apply to a suit for reformation.

In other jurisdictions which have no statute of limitations governing suits for reformation seeking relief from mistake, courts predominantly apply a general statute of limitations governing actions not otherwise provided for. The cases are collected in Annot., 36 ALR 2d 687 (1954). *See, e.g., Travis v. Glick,* 150 Kan 718, 96 P2d 624 (1939); *Louisiana Oil Ref. Corp. v. Gandy,* 168 La 37, 121 So 183 (1929), appeal dismissed, *cert. denied* 280 US 516, 50 S Ct 65, 74

---

*Cf.* Citizens Ins. Co. v. Signal Ins. Co., 261 Or 294, 493 P2d 46, 47 (1971) (this statute governs an action sounding in tort).

L Ed 587 (1929); *Hoester v. Stammelmann,* 101 Mo 619, 14 SW 728 (1890); *Saull v. Seplowe,* 32 Misc 2d 303, 223 NYS2d 324 (1962) (construing Civil Practice Act § 53; for New York's current statute governing actions based upon mistake, *see* 7B CPLR § 213(6) (West 1972)); *Bryant v. Swetland,* 48 Ohio 194, 27 NE 100 (1891); *Maloy v. Smith,* 341 P2d 917 (Okla. 1959); *Strong v. Garrett,* 148 Tex 265, 224 SW2d 471 (1949) (construing Article 5529, VACS (Vernon 1958)); *Langer v. Stegerwald Lumber Co.,* 262 Wis 383, 55 NW2d 389, 36 ALR2d 679 (1952), rehearing denied 56 NW2d 512 (1953); *Town of Glenrock v. Abadie,* 71 Wyo 414, 259 P2d 766 (1953), rehearing denied 72 Wyo 111, 262 P2d 393 (1953). *See also,* 53 CJS 1076, Limitations of Action § 103 (1948).

■ In Oregon, the catch-all statute of limitations is ORS 12.140, which states:

"An action for any cause not otherwise provided for shall be commenced within 10 years."

In accord with the weight of authority, we hold that this statute governs a suit for reformation.

■ Defendants correctly contend that a plaintiff may be guilty of laches even though the applicable statute of limitations has not run if substantial prejudice to the defendant's position has resulted from the plaintiff's delay. *See* 2 Pomeroy, Equity Jurisprudence § 419A (5th ed Symons 1941). Defendants claim that the death of Robert H. Max prior to the institution of this suit has substantially prejudiced their cause.

In *Hanns v. Hanns,* 246 Or 282, 309-10, 423 P2d 499, 513 (1967), we stated:

"* * * Loss or obscuration of evidence is sufficient prejudice to cause a denial of equitable relief

in an appropriate case, and loss of testimony due to death of an important witness is, of course, prejudicial. Stafford v. Ballinger, 199 Cal App 2d 289, 18 Cal Rptr 568 (1962). But the loss of testimony must be a result of an unreasonable delay. * * *"

■ We would agree with defendants' claim of prejudice if defendants' version of the facts differed markedly from that of the plaintiffs. In that case, an additional defense witness could be expected to bolster defendants' position in the eyes of the fact finder. But in this case, the parties assent to most of the facts. Ashcraft and Max received the same representation from plaintiffs and Grayshel concerning the amount of ocean frontage. We are not hindered in our assessment of defendants' defenses by a paucity of evidence. Defendants have failed to prove that Max's death caused them substantial prejudice. The mistake occurred in 1966. In 1969 defendants filed a suit in which plaintiffs requested reformation of the contract, but defendants took a voluntary nonsuit in that case. Plaintiffs filed this suit March 10, 1971, which was within a reasonable time.

Plaintiffs lastly complain of the trial court's finding that their claim is barred by unclean hands. The trial court found that plaintiffs' representation concerning the amount of ocean frontage "was not fraudulent in the classic sense" because it was not made with any knowledge of its falsity or in knowing disregard of its truth or falsity. Nevertheless, the court found that the representation constituted unclean hands because "the manner used by the plaintiffs to measure front footage was not in accord with commonly understood practices of professional standards."

At trial the defendants called Mr. Howard New-

house, a licensed surveyor, to testify concerning the commonly used methods of measuring ocean frontage:

"Q And what procedure is followed in measuring, as to following the curves or the straight lines, or what is generally done?

"A Usually, that request is made by the party, what they want it for. As an example, if the client wanted to have the property measured on a five foot contour line, it would be entirely different than if you were measuring on a straight line basis. The government measures it on a straight line basis.

"* * * * * *.

"Q Now, the second Exhibit here, Exhibit 2, what method was used to compute those distances? [Computed by Mr. Newhouse]

"A Well, essentially, a straight line method, the points on the bluff.

"Q Now, you never did make a measurement on five foot contours?

"A Not on any contour, other than the fact that the straight line method there is on the level, on the flattop, on the bluff.

"Q You didn't do a measurement on five foot contours to see what the distance was?

"A No, not on any contour.

"Q Okay. And if you did take into consideration the contour, your measurement would be considerably greater?

"A Conceivably, yes."

The property in question contains a small peninsula which juts out from the otherwise reasonably straight coastline. Newhouse used the straight line method of measurement and computed the frontage at 738 feet. This measurement excluded the peninsula's outer perimeter. A contour measurement would include the peninsula and would, as Newhouse testified, reflect a larger amount of ocean frontage than would a

straight line measurement. Plaintiffs' computation of 810 frontage feet included the outer perimeter of the peninsula.

■ We cannot see that plaintiffs' use of a 100-foot steel tape to measure the frontage was so unconscionable or unfair as to constitute unclean hands. Plaintiffs' method of measurement was reasonable under the circumstances, and Mr. Woodriff merely told defendants the result of the measurement.

■ An innocent misrepresentation, short of fraud, may justify a court of equity in refusing aid. *Cf.* 2 Restatement 665, Contracts § 367, Comment *a*. However, in view of Mr. Newhouse's testimony, we are convinced that plaintiffs' statements to defendants did not constitute a misrepresentation. It was merely one way a layman could measure the ocean frontage of the property.[2]

The judgment is reversed and the case is remanded for entry of decree in accordance herewith.

---

[2] McClintock on Equity (2d ed), Sec. 26 at 59-61; 2 Pomeroy, Equity Jurisprudence (5th ed) § 397, at 91-93.